All right, the next case is number 21-1051, Pinckney v. Meadville et al. Good morning. Counsel can be seated. We'll hear first from, and correct me if I'm mispronouncing him, Ms. Vanderwood? That is correct, Your Honor. Thank you. Yes, I'm Carol Vanderwood, counsel for Officer Froome in this appeal. The issue before the court is, in our opinion, fairly straightforward. I'm sorry, Your Honor, yes, we would like three minutes for rebuttal. Three minutes, granted. The issue before this court is, in our opinion, fairly straightforward, and it turns on an issue of qualified immunity and the sufficiency of an eyewitness identification. And in this case, we have an eyewitness who observed an assault and, within three days of that assault, was interviewed by Officer Froome and identified, based on pictures provided by a third party, a friend. Okay, before you get to that, tell us why we have jurisdiction. Well, we have jurisdiction in this case because this is an appeal from a motion to dismiss, and the district court accepted the facts in the complaint as true in rendering its ruling. So there are no factual issues here. You're dealing with a second amended complaint. We are dealing with a second amended complaint, and we're dealing with the accepted facts, and these are then pure issues of law. There are no factual disputes. We're proceeding based on the allegations in the second amended complaint. Tell me a little bit about this audio recording. Did you have that when drafting your opposition to the motion, or when did this, where is this audio thing? The audio recording was produced in conjunction with the motion to dismiss to the district court. So the district court did have that, and we have submitted a copy as well of that audio recording to this court. And it was specifically referenced in both the incident report prepared by Officer Froome, it was referenced in the context of the identification, and it was also referenced in the affidavit of... And you attached it to your motion to dismiss, did you not? Correct. But strangely, the district... We did not attach the transcript. We actually attached a CD, sent a CD to the court, so the court had the benefit of it. And we have that, and we've listened to it, but I don't know if we can consider it, because the district court didn't consider it, right? Strangely. I have no idea why. Well, I think this court may consider it, because it's fairly in the record, it's not disputed. It's... It's a 12B6. Correct. So how is this part, then, of the second amended complaint? It's part of the second amended complaint, because it was relied on by the plaintiff in moving for reconsideration, and then also seeking to file a second amended complaint, where he alleges that the statements in the auto reporting, as reflected in the incident report, are mischaracterized in the subsequent affidavit. So this... Why shouldn't we just vacate and remand and instruct the district court to address the recording? The recording's the best evidence of the witness's identification of Mr. Pinckney, which later turned out to be a misidentification. We know that, right? Correct. After the fact. But that was... Officer Frum didn't have any of that information, the exculpatory evidence, within his purview at the time of swearing at the defendant. So the question is whether the officer, Officer Frum, had probable cause when he... Yes. When they asked for the arrest warrant, when he filed the complaint, and did he have probable cause when he filed that affidavit? That's the question. That's the very simple question before the point. What he knew at that time. Correct. In that limited time. And then you don't contest its authenticity in any way? The authenticity of? Of the recording? No. And that is, again, the predicate of the alleged misrepresentations between the incident report and the affidavit of probable cause. You seem to make the argument, though, let's look at what Judge Hardiman has said. It wasn't before the district court. One option for us would be to send it back and direct the district court to evaluate whether probable cause existed, specifically looking at the recording. But as I have read your brief, you also argue that even if the court, based on what the court looked at, that there was probable cause for Frum to file this affidavit and request and get the arrest warrant that he got. Well, I think maybe more accurately characterized or differently characterized, I should say. How do you categorize? Differently characterized. Number one, I do think that the district court did err in not considering that audio recording, which was specifically referenced in the incident report and in the affidavit. Given that it was submitted to the court, given that it was an issue in the second amended complaint and that it was relied on in the filing of the second amendment complaint. If you're correct on that, we could use the approach that Judge Hardiman is suggesting. We could send it back to the district. That is one approach. Yes, you're right. Beside this, considering the facts in the complaint, as well as the audio recording, right? That is a possible approach. You've gone further than that. Yes. I understand why you're here. You're saying that based on what the district court looked at, there was probable cause. Yes. In other words, the rationale that the district court laid out in its opinion to support its conclusion of an absence of probable cause is not supported by the record. Even if you just look at the incident report and the arrest warrant, and you look at the supposed discrepancies identified by the court, that the linchpin of the district court's that the incident report states that the witness, Duncan Freeland, said that the plaintiff, Mr. Pinckney, looked like, or an awful lot like, an awful lot like. Is that enough? Is that enough? Yes.  That's enough to go grab Mr. Pinckney? When read in context and looking at the other possible discrepancies, which was hairstyle, again, when you look at the actual transcript, it wasn't just that he looked like. Get away from the transcript a second. Well, and that's, yeah, I mean, if you wanted the court to review the audio in making this ruling, then you would have had to convert it to a motion for summary judgment. This happens a lot in qualified immunity cases, right, where there's a motion dismissed, filed, but then the parties or the lawyers feel that there needs to be some factual development, and then it gets converted to a Rule 56 motion. And it can be in some instances, but there is also precedent for continuing to consider it in the Rule 12b6 context. Right, but we can't consider the audio recording in the 12b6 context. I think the court absolutely can in this particular case because it is part of, it is relied on by the plaintiff in asserting the allegations in the Second Amendment complaint with respect to a lack of probable cause. And it was, in fact, presented to the district court and then further briefed in response. It's just not the way we usually do things. When we review whether district judges err, we're looking at what they considered. We don't look at things they didn't consider. I would agree, Your Honor. And you'd agree that here the district court was explicit that it didn't consider, well, I guess it didn't affirmatively say, I'm not considering the audio recording. There's no evidence. There's no statement that it did. No statement that it did. Right, correct. Aren't you really here for a different reason, perhaps? You're here arguing, as you said right off the bat, that the officer front is entitled to qualified immunity. Well, that's why you're here. You're here for jurisdiction, absolutely. You're trying to get us to look at what's in front of us that we're allowed to look at and to conclude that as a matter of law, either under Prong 1 or Prong 2, that your client is entitled to qualified immunity. Yes, that his belief in the lawfulness of his actions was objectively reasonable under the circumstances, given that an eyewitness had identified plaintiff as the assailant within three days of the assault. What if we don't agree with you under Prong 1? What if we say that without that recording, without that recording, the district court was correct in finding that there was an absence of probable cause? Go to Prong 2. Were the rules that the officer in question here followed, were they clearly established? I do think that the officer knew. It was clearly established that he needed probable cause to swear out an affidavit. Don't you have to go down further? We have an eyewitness identification case here. Yes, and I think the precedent of the circuit would give this officer a reasonable basis to believe that his conduct was lawful under these circumstances because he had an independent eyewitness within three days of the assault. I don't like the guy who I saw throw the punch. That's enough? Well, he also said he recognized him as having the same similar features, and the affidavit does say recognized. He said very clearly, though, there was a difference in the hairstyle. This is where you're trying to get me to go back to the audio tape. Well, again, though, the identification was not predicated on the hairstyle, and I think when you look at both the incident report and the affidavit of probable cause, you can see that. In fact, the incident report is, frankly, a little more clear in the identification. It says some kind of braided hairstyle. I think where the district court was and what I'm trying to get to, based on what information the officer had at the time he made the application for the arrest warrant, wasn't there some room for him to pause and say, you know what, Freeland says it looks a lot like, but there's a difference in hairstyle. Maybe I need to go talk to a couple other people out there and ascertain whether or not Pinckney was really the guy that threw that punch. He'd spoken to several people. No other witnesses were able to offer identification. Did he speak to Shaw? Mr. Shaw would not cooperate. Shaw was the one that supposedly threatened Happel. You'd think he would be the first one that you'd talk to. A day earlier. But frankly, the fact that Shaw and Mr. Pinckney were both in the same photograph, and there's no dispute that Mr. Pinckney is in that photograph with Mr. Shaw, would, I think, frankly, further a reasonable belief that Mr. Pinckney could have been involved in this assault because his friend, as evidenced by the photograph, was allegedly, according to what Officer Froome knew, involved in an assault against Mr. Happel earlier. So that actually, we think, is a fact that would support the reasonableness of Officer Froome's actions. Guilt by association? Not certainly guilt by association, but just different facts that were within the purview of the officer at the time, and that's what we're supposed to be looking at, the totality of the circumstances. And I think this circumstance actually weighs in favor of a finding of the reasonableness of Officer Froome's actions in this context. Did this misidentification happen because there was some kind of code of silence by all the witnesses? Because it was remarkable how quickly they got the real perpetrator after Mr. Pinckney was taken into custody, right? That seemed to happen very quickly. That didn't follow additional investigation, necessarily. If you look at the record, if you even look at the allegations in the complaint... But didn't people come out of the woodwork and say, you got the wrong guy? After an article was published, that's what predicated this. Did they ever arrest that other guy? I think it was a Josiah Williams. I can't say for certain, but I do know that the investigation was continuing with respect to that another individual. I have one question, going back to the recording before you sit down, or maybe on rebuttal you want to cover it. The case of Beverly Enterprises versus Trump. There they said a video submitted of the meeting could not be relied upon. Are you familiar with that case? I am not. Beverly versus Trump? I did not. I don't think I briefed that in the context of this case. But again, what we have to look at is this record and how the issue arose before the district court in this case. And we're on a second amendment complaint. We have numerous materials cited in support of the second amendment complaint, including incomplete materials that were flushed out in the filing of the motion to dismiss with the complete documents, including the incident report, the affidavit for the arrest warrant. And that, again, these items, which were the predicate for the allegations in the second amendment complaint, the identification in the incident report and the arrest warrant both reference the audio recording and that this recording is the basis for the swearing out of the arrest warrant. And the district court had the opportunity to review it. There's no indication they actually did. But certainly, I mean, we would agree with the court that that is the best evidence as far as the quality of the identification. Thank you, Ms. Vanderwood. We'll hear you on rebuttal. Mr. Rayner? Good morning, Your Honors. Good morning. May it please the court, my name is Earl Rayner and I represent the appellee, Colby Pinckney. Let me begin by saying this is a high honor to be in this courtroom, the United States Court of Appeals. I don't practice regularly on this level, though I've been an appellate lawyer for many years. You've come all the way to Pittsburgh to do it. Yes, sir. It was some ride on the turnpike curves at night, but that's okay. You see what we have to do a lot. Yes, sir. Yes, sir. I saw that. It's an honor to be here, but unfortunately, we are here prematurely. The appellate is putting the court before the horse. There is no final judgment in this case. This appeal falls from the denial of a motion to dismiss false arrest versus prosecution. And the argument is that, well, qualified immunity is reviewable at the appellate court stage, and that's true. However, it's only reviewable if there are abstract questions of law involved. I think it's well settled that a police officer, someone in law enforcement, may not break the law to secure an arrest of somebody. They can't step into a courtroom, purge themselves before a magistrate and say, an eyewitness has come to me and possibly identified Colby Peten, the SGA assailant, when there is no such identification. Now, the appellate wants the court to review the factual determinations of the lower court. However, it's quite clear that this court lacks jurisdiction at this stage. It has jurisdiction once there's a final judgment, once there's been a verdict by a jury, or there's been a- You concede qualified immunity is an issue that is raised regularly on these interlocutory appeals. So we do have jurisdiction to address those, right? When it's a legal question, not a factual question. That's right. The whole line between jurisdiction and no jurisdiction is legal and factual, right? Yes, Your Honor. And I assume you'd agree we can't consider, at this stage, the audio recording. That's correct. But what we can consider are the documents, the incident report, etc. Well, yes. We can consider whether that bundle of facts, viewed in the light most favorable to you as the plaintiff's counsel, your client, whether those facts, as applied to the law, there's probable cause under the law. That's what we have to decide, right? I disagree respectfully. I think that- I understand that the court- I'm granting you- Yes. I'm granting you your facts. Yes. Anywhere Ms. Vanderwood challenges your facts- Yes. I think we have to discount anything she says on that, and we have to grant you your facts. Yes. And then we have jurisdiction to consider whether your facts rise to the level of probable cause. The district court said they don't rise to the level of probable cause, but we have to decide whether that was correct, right? I just believe that it's not right for this court to consider a factual conclusion of the lower court at this stage. We're not going to challenge it. We're going to accept the facts. Okay. We've got to- It's our duty to review the legal conclusions of the district court. Yes, yes, yes, yes. So let's focus on the legal conclusion. The legal conclusion was no probable cause. Right. And why do you say there's no probable cause when on this reconstructed affidavit of probable cause in the incident report, you've got Duncan Freeland saying that Pinckney looked an awful lot like the one that punched Happel at the bar. How come that's not probable cause? Because that's not an identification. First of all, Duncan Freeland knew Kobe Pinckney. He had been put up to by the dean of students to investigate my client because there was some word around the door that my client had been smoking marijuana in this room. And so one of the- Was that in your second amended complaint? Yes, Your Honor. That Freeland knew Pinckney before? Yes, Your Honor. He knew him before because the dean of students had conducted an investigation on my client for smoking marijuana and for other infractions. And, in fact, one of the parties to the case, the dean of students, So Appellate and the defense in this case are aware that Joe Hall, who was the dean of students, had dispatched Duncan Freeland and other RAs to look in on my client, see if he was engaged in mischief. He knew him, and that's why he said he recognized him, because he, in fact, knew him. All right, so your theory of the case, which is certainly plausible, is that they had it in for Pinckney and they put Freeland- The supervisory arm of Allegheny College was out to get Pinckney. Yes. And Freeland was the instrument they used to get him. Yes, yes. All right, let's assume all that's true, it's plausible. Any evidence? Did you plead anything that Frum knew anything about that? Because, remember, Frum is on the hot seat here, not- I understand that. Not the people you allege to be malefactors at the college. So how do you connect their evil intent, as you put it forth, with Frum's knowledge? Is there anything in your complaint? No, there's nothing in our complaint regarding- So all Frum gets is a witness pointing to Pinckney. So what's Frum's- Right, a witness- What's to do with that, other than do a better investigation? I think everyone can agree the investigation here should have and could have been better. Well, my argument with regard to Duncan Freeland is that he was hesitant because of the facts involving the activity he was engaged in at the dorm,  That's why he was hesitant. And that's why he didn't possibly identify him as the person, because he knew it. And so it's one thing if he would have told Officer Frum, Yes, that's him, I saw him, he's the person that did it. But when he says it looks kind of like him, their hair is different, and in fact, it's not my client. You're saying Freeland didn't positively identify Pinckney? Not even close. He said it resembles. And if he did positively identify Pinckney, then Frum is off the hook. He's not liable because then he has probable cause. But then he's telling the truth, that there was an identification. So I can tell you that there was no such identification, that he didn't tell the truth. Here it says, like you said, you've just seen him tap Rhett on the shoulder. Rhett looked around. You've seen Kobe throw the punch. Answer, yep. Right. Yep might be some form of slang. But it seems like an assent. Is that from the recording? That's from the recording. Yeah, but we can't. Right. Why should we send this back? Well, you have to send it back. The best evidence was not referenced by the district court. And speaking only for myself, I don't think we have the power or the right to mention that best evidence for the first time here. Or maybe we have the power, but I think it would be inappropriate for us to reference evidence that the district court never explicitly took cognizance of. Does that make some sense? It does, but you just cited the Trump case where that's not even reliable. The Trump case says that. Well, but if you want to argue to the district court that the audio recording is a fraud or a deep fake or unreliable, then fine. You can make that argument. But I don't think we should be getting into that. That's what trial judges are for. Are you familiar with that Trump case? Trump versus Beverly? For the last two or three minutes, yes. Okay. Yes. Yes. Now. You are now. I'm going to grab it. Yes, I am. Yes. Yes. You kind of did, Your Honor. Yes, sir. Yes, sir. But it's just our contention that why should the district court even vet that? That's got to be part of discovery. Why should the district court vet the best evidence? Well, because we're past that stage now. He denied the motion to dismiss. It's time to move on to discovery. Exactly. I think you've identified exactly how I see this case, which is let's get to the next stage. The next stage is full-blown discovery and motions practice on Rule 56. And if there are material issues of fact, then let's have a jury, put a jury in the box. And if there aren't issues of material fact, you win on summary judgment or Ms. Vanderwood wins on summary judgment. Yes. That seems to be the appropriate judicial process. I don't know where the result goes. Right. But that would be a process, again, speaking only for myself, that would make more sense than where we are right now. But that's my argument, that this court doesn't have the jurisdiction to decide the factual question. That has to be decided in lower court, not by Judge Lanzillo, but through discovery. I mean, can we just accept the audio taken in light of Trump? Can we just accept what? The audio in light of Trump. The what? I'm sorry.  Can we just accept it at face value? Accept the audio? I mean. No. No. I mean, again, I used to look at evidence, but that was when I sat on a bench like this by myself. And now I have colleagues that are smarter and more experienced than I am. So I don't have to look at evidence anymore. Okay. Okay. With regard to that, did you have – Curiosity. Did you have that audio recording when you were drafting your opposition to the motion? I did not have it, no. No. You had not received it? I have not received it, no. Okay. No. You hadn't received it when? I have not received the audio recording. First of all, you knew in your complaint you attached the incident report. Yes, yes, yes. The incident report refers to the audio. Right, that's correct. That's correct. Okay. When the opposing counsel filed the motion to dismiss, they attached the digital file of the audio recording. Okay. You knew at that point, right? Yes, yes, yes. Okay. So you had a chance to review the audio recording before arguing the motion to dismiss. No, I did not. Not prior to. You maybe didn't review it, but you had the chance to review it. Yes, I had a chance to review it. Yes, yes, yes. You had a chance to review it. So you knew of its existence. Yes. I knew of its existence, yes. Okay. And the question here, the legal question for us, which we're struggling with, is why should that be part of our decision on the motion to dismiss, if in fact the district court didn't base its decision on that digital audio record? I mean, that's really the issue we're trying to get you to focus on. Yes, yes, yes. So you haven't opposed it, you haven't disputed the authenticity or anything like that of this recording, right? Well, I'm not stipulating to the recording. No, I'm not stipulating to it. That has to be dealt with in discovery. Right, right, right. Right, that has to be done through discovery. I just assume that we get to the next phase, we get the recording, I get to question the people in the audio. That's what I assume. I mean, yeah. Any questions? Thank you very much, Mr. Raynor. Thank you, Your Honor. Thank you. We'll hear the rebuttal of Ms. Vanderwood. Just a point of clarification. I am familiar with the Beverly case, just not that particular evidentiary issue, which I, too, will be looking into. Because there's another point in the Beverly case that helps you. I will be looking into that as well, Your Honor. But just briefly, I think Mr. Raynor articulated, I think, the crux of his theory here against Officer Frum, and that really is not Officer Frum per se, but that Mr. Freeland was somehow involved in a conspiracy, and therefore you can't believe anything that he said. But, again, that goes back to even on the facts that have been established and putting aside the audio recording, none of that information was available to Mr. Frum at the time that he swore out the arrest warrant. This is all. Right, right, all right. That makes sense. But you want us to reverse. You want a judgment in your favor, correct? Yes, we would advocate for reversal, but certainly, Your Honor, remanding to the district court to consider its ruling in light of the audio recording, I think. Because let me just play out a hypothetical. Let's assume that Duncan Freeland was weaponized against Kobe Pinckney at the behest of and on behalf of his superiors at the college. That's terrible if that happened, right? Mr. Raynor should have a right to dig into that. Now, if it turns out that that happened, but Officer Frum knew nothing about it, then presumably he has a defense, right? He can say, well, I didn't know that this guy was motivated to lie or point a finger at an innocent man. But I think here the crux of the issue is we have a very lengthy second amended complaint. These are detailed allegations. They're very thorough. They involve matters of public record. They involve submissions of other complaints filed by other parties against the college, who really does seem to be the target here of the ire as far as how this whole situation arose. But putting that aside, there's no dispute based on the lengthy allegations in the complaint, which are very detailed in many respects, that Officer Frum did not know anything about this so-called weaponization with respect to Allegheny County in the three days of the investigation. Your response to what I just outlined is even if all that happened, it wasn't pleaded? Even if all that happened, it's within the context of the complaint, and nothing was pleaded to show that Officer Frum knew about any of that. Okay. Was there anything in the complaint, the second amended complaint, that indicates that Officer Frum knew Kobe Pinckney? Officer Frum knew Kobe Pinckney? No. No. That, excuse me, that Freeland knew Kobe Pinckney? Well, I think— He was his RA, wasn't he? Well, I think you can—I mean, Freeland identified Kobe Pinckney from a picture. He obviously knew who Kobe Pinckney was and what he looked like because he was able to say, I know from school Mr. Shaw, and I know Mr. Pinckney, and— Why did he need a picture? If he knew Kobe Pinckney, why did he need to give him a picture to say, could have it been Kobe Pinckney that sucker-punched Hoppel? His friend sent him the picture. He was interviewed as a witness, and he said, based on these pictures, this is the person that looks like— You already know the person. If he already knew the person, if he already knew Kobe Pinckney, why didn't he right away say, it was Kobe Pinckney who hit Rhett? I don't know why Duncan Freeland didn't just say, didn't just come in and say, you know, I have these pictures, but don't worry about them. I know Mr. Pinckney. Before I ask you, is there anything in the complaint that said Freeland knew Kobe Pinckney when he gave that audio recording? There are allegations in the complaint to support the conspiracy theories against the county. Like you said, this weaponization. So outside of the context of anything Officer Froome knew, no allegations that Officer Froome had any knowledge of anything that was going on with respect to a marijuana complaint, RAs, any of that information. This was all after the arrest that this information came out. So, again, when we look at what Officer Froome knew, and I think your honors are correct, the audio recording is the best evidence as far as the identification. If it's authentic. Mr. Rayner's questioning is it's authentic. This has been in the record for an extensive period of time. Quite frankly, you don't come to the Third Circuit on appeal after filing multiple complaints and extensive briefing with reply and supplemental briefs and for the first time say, well, I'm not going to concede the authenticity of something I've never challenged before. I mean, he can certainly do that, but I honestly don't think that's going to carry a whole lot of weight at the end of the day. But, you know, that's not what we're here before this court to address. We're looking at what the identification that Officer Froome had and whether that was sufficient to support probable cause. And even if it's not, whether his belief in the lawfulness of his actions, based on what he knew with respect to the identification, were reasonable under the circumstances. And, frankly, we think they are on this particular record, which, again, if you look at the complaint, focuses all of the conspiracies outside of the context of what Officer Froome knew. This is not going on within the purview of Officer Froome. And it's a lengthy complaint. It's a Second Amendment complaint. And absolutely nothing, even in the briefing before this court, no argument was raised that Officer Froome knew anything about this. And, again, no challenge was made to the audio recording, which was quoted and cited at length in the briefing before this court. So... All right. Thank you, Ms. Vanderwood. Thank you, Mr. Raynor. Very helpful arguments. We'll take the matter under advisement.